**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

United States of America,

        Plaintiff,                         Case No.  1:18cr80

        v.                             Judge Michael R. Barrett

Alon Russell,

        Defendant.

## OPINION & ORDER

This matter before the Court upon Defendant Alon Russell's Motion to Suppress.  (Doc. 17).  The United States has filed a Response in Opposition (Doc. 27) and Defendant filed a Reply (Doc. 28).  On August 21, 2018 and September 10, 2018, a hearing was held on the Motion. (Docs. 19, 20, 23, 25).  The United States presented the testimony of Wilmington Police Officer Robert Martin and Wilmington Police Sergeant Neil Rager.  Defendant presented the partial testimony of Jennifer Alston.[1]

## I.  BACKGROUND

The United States has brought one count against Defendant: possession of a firearm by a prohibited person in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2) and 18 U.S.C. § 2.

In his Motion to Suppress, Defendant seeks to suppress the evidence obtained in a search of his home conducted by members of the Wilmington, Ohio Police Department.   Defendant

---

[1]The Government orally moved to strike the testimony of Alston at the conclusion of the hearing, but the Court notes that the Government also relies on Alston's testimony in its Response to Defendant's Motion to Suppress.  (Doc. 27, PAGEID# 129-130).  Alston's testimony was incomplete because after Alston testified at the hearing that the guns found during the search belonged to her, Alston was advised of her rights and was appointed an attorney.  (Doc. 20, PAGEID# 53-57).

maintains the search was conducted in violation of his Fourth Amendment rights because officers failed to obtain a search warrant or valid consent to search the home.

On May 20, 2018, City of Wilmington Police Department Sergeant Neil Rager arrived at a house on Darbyshire Road in Wilmington, Ohio. (Doc. 25, PAGEID# 17). Sergeant Rager was responding to a 911 call made by someone who was driving past the house and saw "a male hitting on a female in the front yard of a house." (Gov't Exh. 1; Doc. 25, PAGEID# 78). Officer Rager testified that he been to this house on Darbyshire Road on other occasions and that "[u]sually it's the lady that owns the house wants somebody removed for disturbances, loud arguing." (Doc. 25, PAGEID# 81).

Officer Rager's body camera footage from that day was introduced at the trial as Government's Exhibit Two.

When Sergeant Rager arrived at the house, no one was in the front yard. (Doc. 25, PAGEID# 79). As he was walking up to the front of the house, Sergeant Rager saw a young boy coming out of the house with a basketball, and asked the boy if his mom or dad were home. (Doc. 25, PAGEID# 82; Gov't Exh. 2 at 0:48). The boy ran into the house and a young female walked out of the house. (Doc. 25, PAGEID# 82).[2] Sergeant Rager explained to her why he was there. (Doc. 25, PAGEID# 82). The female then told Sergeant Rager that the people who were fighting were in the garage. (Gov't. Exh. 2, at 1:40). When Sergeant Rager asked how he could get into the garage, the female started walking into the front door of the house. (Gov't. Exh. 2, at 1:45). Sergeant Rager followed the female into the house and the female showed him to a door which led to the garage. (Doc. 25, PAGEID# 82-83). Sergeant Rager went to the door, but it was locked. (Doc. 25, PAGEID# 83). The female told Sergeant Rager that this was not her house, but it

---

[2]On Sergeant Rager's bodycam video, the boy can be heard responding, "My mom is not here, but [inaudible]." (Gov't. Exh. 2, at 0:50). The boy then runs into the house. (Gov't. Exh. 2, at 0:57)

belonged to "Christy" who was not there.  (Gov't. Exh. 2, at 1:53, 2:17).  Sergeant Rager asked a male who was sitting on a couch inside the house if he had been the one fighting in the front yard. (Gov't. Exh. 2, at 2:07).  The male got off the couch and explained that the people who had been fighting were in the garage.  (Gov't. Exh. 2, at 2:29).  Sergeant Rager then knocked on the door to the garage.  (Doc. 25, PAGEID# 83).  Defendant opened the door.  (Doc. 25, PAGEID# 83). Sergeant Rager testified that he could see into the garage and it was full of "loose random furniture" and looked like a place where people "just slept there overnight."  (Doc. 25, PAGEID# 84).  Defendant had a backpack on his shoulder when he came to the door.  (Doc. 25, PAGEID# 83, 95).  When Sergeant Rager asked Defendant where he lived, Defendant told Sergeant Rager that he was staying there.  (Doc. 25, PAGEID# 96).

Sergeant Rager testified that because was on the scene alone and he could see that there were other people in the house, he asked Defendant to step outside to talk to him.  (Doc. 25, PAGEID# 83-84).  Sergeant Rager testified that before Defendant left the doorway, he "deliberately set [the backpack] down on the floor."  (Doc. 25, PAGEID# 84).  However, Defendant did not go outside as instructed.  Instead, Defendant went to the back of the house yelling for the "house lady."  (Doc. 25, PAGEID# 85).  Defendant then walked out the back door and yelled to people in the yard, asking them, "where's the lady at?"  (Doc. 25, PAGEID# 85). Sergeant Rager followed Defendant.  (Gov't. Exh. 2, at 4:22).  Sergeant Rager's bodycam video shows that outside there was a man and a woman in a fenced-in yard working on a lawnmower, another adult male in the yard who appears to be smoking, a toddler in diapers on the back deck along with least two other children.  (Gov't. Exh. 2, at 4:15 to 4:24).  None of these people responded to Defendant or spoke to Sergeant Rager.  Sergeant Rager continued to follow Defendant as he walked back into the house, became more and more agitated, and repeatedly

3

asking "somebody to call somebody." (Gov't. Exh. 2, at 4:27 to 4:34). Inside the house, Sergeant Rager and Defendant got into a scuffle, and Sergeant Rager arrested Defendant for obstructing, assault and resisting. (Doc. 25, PAGEID# 86).

After Sergeant Rager took Defendant outside and placed him in the back of his police vehicle, he had a conversation with Jennifer Alston, who told him Defendant's name and explained that she was Defendant's fiancé. (Doc. 25, PAGEID# 97-98). Sergeant Rager walked back towards the front door where he was met by two of the adult males coming out of the house. (Gov't. Exh. 2, at 13:12). Sergeant Rager asked them whose house this was, and the men responded that the house belonged to "Christy" and she was not home. (Gov't. Exh. 2, at 13:20 to 13:25). Sergeant Rager asked to speak to the young woman again. (Gov't. Exh. 2, at 1:45). The two men yelled to her to get her to come outside, and she came to the front door carrying a child. (Gov't. Exh. 2, at 1:45). Sergeant Rager then went back into the house. (Doc. 25, PAGEID# 87). At the hearing, Sergeant Rager explained that he went back into the house because wanted to "talk to the witnesses and to see why [Defendant] had left his backpack behind." (Doc. 25, PAGEID# 87). Sergeant Rager testified that there were a total of approximately eight adults and children in the home. (Doc. 25, PAGEID# 86). At no time did anyone in the house tell Sergeant Rager that he did not have permission to go back into the house or into the garage. (Doc. 25, PAGEID# 87-88).

When Sergeant Rager saw the backpack it was partially unzipped. (Doc. 25, PAGEID# 88). Sergeant Rager could see part of a pistol grip. (Doc. 25, PAGEID# 89). Sergeant Rager removed it from the garage and took it outside in order to maintain control of the area. (Doc. 25, PAGEID# 91). Jennifer Alston was present from the time Sergeant Rager picked up the backpack and brought it outside. (Gov't. Exh. 2, at 13:41 to 14:45). Sergeant Rager and Alston discussed

who the backpack belonged to and what was in the backpack, but at no point did Altson object to Sergeant Rager entering the garage or searching the backpack. (Id.)

Wilmington Police Officer Robert Martin testified that when he arrived on the scene, he removed a Taurus .40 caliber pistol and MasterPiece Arms .45 caliber pistol from the backpack. (Doc. 25, PAGEID #70-72; Gov't Exh. 8-A; Gov't Exh. 9-A).

Defendant maintains that neither he, his fiancé, nor any third-party gave the Wilmington, Ohio police officers permission to search the house, let alone his living area in the garage. Defendant argues that as a result, the search violated his Fourth Amendment rights and the evidence discovered as a result of the search should be suppressed.

The United States responds that (1) Defendant lacks standing to contest the entry of law enforcement into the house; (2) the weapon was in plain view of the officer; and (3) Defendant abandoned the backpack.

## II.   ANALYSIS

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. The "chief evil" against which the Fourth Amendment protects is the "physical entry of the home." *Payton v. New York*, 445 U.S. 573, 585, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). Warrantless searches and seizures "are per se unreasonable . . . subject only to a few specifically established and well delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

### A. Standing

The Government argues that Defendant lacks standing to contest the search of the house. A person has standing to challenge the search of location if he or she has a reasonable expectation

of privacy in the residence. *See United States v. Washington*, 573 F.3d 279, 282–83 (6th Cir.

2009). The United States Supreme Court has recently explained:

> The concept of standing in Fourth Amendment cases can be a useful shorthand for capturing the idea that a person must have a cognizable Fourth Amendment interest in the place searched before seeking relief for an unconstitutional search; but it should not be confused with Article III standing, which is jurisdictional and must be assessed before reaching the merits. *Arizona Christian School Tuition Organization v. Winn*, 563 U.S. 125, 129, 131 S.Ct. 1436, 179 L.Ed.2d 523 (2011) ("To obtain a determination on the merits in federal court, parties seeking relief must show that they have standing under Article III of the Constitution"); *see also Rakas*, *supra*, at 138–140, 99 S.Ct. 421. Because Fourth Amendment standing is subsumed under substantive Fourth Amendment doctrine, it is not a jurisdictional question and hence need not be addressed before addressing other aspects of the merits of a Fourth Amendment claim.

*Byrd v. United States*, 138 S. Ct. 1518, 1530–31, 200 L. Ed. 2d 805 (2018). Even though the Court

need not address the issue of standing first, the Court chooses to do so in this instance because the

question as to whether Defendant has standing to challenge the search can be easily resolved in

this case.

It is well-settled that an overnight guest retains a "legitimate expectation of privacy in his

host's home" sufficient to establish standing to challenge the validity of a warrantless search.

*Minnesota v. Olson*, 495 U.S. 91, 98 (1990) (explaining that explained, a person's "status as an

overnight guest is alone enough to show that he had an expectation of privacy in the home that

society is prepared to recognize as reasonable."); *see also United States v. Allen*, 720 Fed.Appx.

254, 257 (6th Cir. 2018) ("People—whether renters, couch surfers, or nomads—have a reasonable

expectation of privacy in places that function as home."). The evidence establishes that Defendant

was, at the very least, an overnight guest.

The Government also argues that Defendant lacks standing to contest the search of the

backpack because Defendant's fiancé, Jennifer Alston, testified at the suppression hearing that the

backpack belonged to her. (Doc. 20, PAGEID# 53). However, the only credible evidence is that

the backpack belonged to Defendant. When Sergeant Rager first encountered Defendant, Defendant was carrying the backpack on his shoulder. In addition, Officer Martin testified that he removed prescription bottles from the backpack, and that these bottles had Defendant's name on them. (Doc. 25, PAGEID# 74).

### B. <u>Plain view</u>

"[U]under certain circumstances the police may seize evidence in plain view without a warrant." *Coolidge v. New Hampshire*, 403 U.S. 443, 465, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). The plain-view exception, however, applies only when "the officer did not violate the Fourth Amendment in arriving at the place where the evidence could be plainly viewed." *United States v. Taylor*, 248 F.3d 506, 512 (6th Cir. 2001).

"Four factors must be satisfied in order for the plain view doctrine to apply: (1) the object must be in plain view; (2) the officer must be legally present in the place from which the object can be plainly seen; (3) the object's incriminating nature must be immediately apparent; and (4) the officer must have a right of access to the object." *United States v. Garcia*, 496 F.3d 495, 508 (6th Cir. 2007).

Defendant does not appear to contest Sergeant Rager's initial entry into the home. One exception to the warrant requirement is "a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (citing *Davis v. United States*, 328 U.S. 582, 593-94 (1946)). "Consent to enter need not be explicit." *Smith v. City of Wyoming*, 821 F.3d 697, 709 (6th Cir. 2016). It "may be given in the form of words, gesture or conduct." *United States v. Carter*, 378 F.3d 584, 587 (6th Cir. 2004) (en banc). "Proof of voluntary consent 'is not limited to proof that consent was given by the defendant,' but the government 'may show that permission to search was obtained from a third party who possessed common authority over or other sufficient

relationship to the premises.'" *Georgia v. Randolph*, 547 U.S. 103, 128–29, 126 S. Ct. 1515, 1531, 164 L. Ed. 2d 208 (2006) (quoting *United States v. Matlock*, 415 U.S. 164, 171, 94 S. Ct. 988, 993, 39 L. Ed. 2d 242 (1974)).

Sergeant Rager's bodycam video shows a young woman opening the door to the house and pointing him toward the garage door inside the house. While the initial entry in the house does not appear to be a part of Defendant's Motion, the Court finds for the sake of completeness that there is sufficient evidence of consent to the initial entry into the home.

The Court now turns to Defendant's first argument, which is that Sergeant Rager did not have consent to search the garage area after his arrest. The Government responds that Sergeant Rager was permitted to enter the garage where Defendant was living as part of a protective sweep of the area.

In *Maryland v. Buie*, the Supreme Court held that officers making arrests in the home are permitted to conduct a protective sweep: a "quick and limited search of the premises, incident to an arrest and conducted to protect the safety of the police officers and others." 494 U.S. 325, 327, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). The Court explained that there are two different types of justifiable protective sweeps. The first type allows officers to "look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Id*. at 334. The second type of sweep goes "beyond" immediately adjoining areas but is confined to "such a protective sweep, aimed at protecting the arresting officers." *Id*. at 334–35. The first type of sweep requires no probable cause or reasonable suspicion, while the second requires "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id*. at 334.

However, there is nothing in the record which would indicate that Sergeant Rager was looking for another person when he re-entered the home to search the garage area. When Sergeant Rager arrived on the scene, he was told that the man and woman who had been fighting were in the garage. Sergeant Rager encountered Defendant when he opened the garage door. After Sergeant Rager arrested Defendant, Sergeant Rager spoke with Alston, who told him that she was Defendant's fiancé and confirmed that they had been the two people fighting in front yard. (Gov't. Exh. 2, at 7:49). After speaking with Alston, Sergeant Rager went back into the house to search the garage. There are no facts in the record which would indicate that Sergeant Rager believed there was an individual in the area posing a danger to those on the arrest scene.

The Government argues that there was some other risk of danger. Exigent circumstances may justify a warrantless entry into a residence. *United States v. Morgan*, 743 F.2d 1158, 1161 (6th Cir. 1984). Exigent circumstances "are situations where real immediate and serious consequences will certainly occur if a police officer postpones action to obtain a warrant." *United States v. Williams*, 354 F.3d 497, 503 (6th Cir. 2003) (quoting *Ewolski v. City of Brunswick*, 287 F.3d 492, 501 (6th Cir. 2002)). The Sixth Circuit has identified the emergency situations giving rise to the exigent circumstances exception requirement as: (1) hot pursuit of a fleeing felon, (2) imminent destruction of evidence, (3) the need to prevent a suspect's escape, or (4) a risk of danger to the police or others. *Williams*, 354 F.3d at 503 (citing *United States v. Johnson*, 22 F.3d 674, 680 (6th Cir. 1994)). Under the fourth exception, "[o]fficers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Schreiber v. Moe*, 596 F.3d 323, 329-30 (6th Cir. 2010) (citing *Michigan v. Fisher*, 558 U.S. 45, 47 (2009)).

The Court finds that exigent circumstances did not exist in this case. The scene at the house was somewhat chaotic when Sergeant Rager arrived, but there had been no mention of a gun by the 911 caller or anyone present in the house. The main source of the chaos at the scene was Defendant himself and his refusal to cooperate. However, Sergeant Rager had placed Defendant in the back of his police vehicle before he went back into the house. Defendant no longer presented a risk of danger at that time. Moreover, while the subjective intent of a law enforcement officer is irrelevant in determining whether that officer's actions violate the Fourth Amendment, *Brigham City, Utah v. Stuart*, 547 U.S. 398, 404, 126 S. Ct. 1943, 1948, 164 L. Ed. 2d 650 (2006), Sergeant Rager testified as to his reasons for returning into the house:

> Q. Okay. So knowing the door was -- had been locked, knowing that he had told you that he was staying there, you decided to re-enter instead of getting a warrant?
>
> A. Correct.
>
> Q. Why is that?
>
> A. Because I wanted to see what the bag was, and he stated he was staying at the house.
>
> Q. You had other officers on the scene, correct?
>
> A. Correct.
>
> Q. They could have secured the residence and made sure that the bag, that no one came around the bag?
>
> A. Correct.
>
> Q. And make sure that was not a danger to anybody there?
>
> A. Correct.
>
> Q. But you wanted to see the bag?
>
> A. Correct.

(Doc. 25, PAGEID# 112).

The Court finds the resolution of this case lies in a much more straightforward application of Fourth Amendment law.  In this case, Defendant never expressly refused consent to allow Sergeant Rager to search the garage.  Alston also did not refuse to allow Sergeant Rager to search the garage or the backpack.  Sergeant Rager's bodycam footage shows several adults in the house at the time of Defendant's arrest.  None of these adults refused to allow Sergeant Rager to search the garage.

In *Fernandez v. California*, the Supreme Court affirmed the rule that "consent by one resident of jointly occupied premises is generally sufficient to justify a warrantless search." 571 U.S. 292, 300, 134 S. Ct. 1126, 188 L. Ed. 2d 25 (2014).  The Court explained:

> . . . the lawful occupant of a house or apartment should have the right to invite the police to enter the dwelling and conduct a search.  Any other rule would trample on the rights of the occupant who is willing to consent.  Such an occupant may want the police to search in order to dispel "suspicion raised by sharing quarters with a criminal." 547 U.S., at 116, 126 S.Ct. 1515; *see also Schneckloth*, 412 U.S., at 243, 93 S.Ct. 2041 (evidence obtained pursuant to a consent search "may insure that a wholly innocent person is not wrongly charged with a criminal offense").  And an occupant may want the police to conduct a thorough search so that any dangerous contraband can be found and removed.

*Id*. at 307; *see also Georgia v. Randolph*, 547 U.S. 103, 106 (2006) ("The Fourth Amendment recognizes a valid warrantless entry and search of premises when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-occupant who later objects to the use of evidence so obtained.").

Here, the bodycam video is evidence that the occupants of the house voluntarily consented to Sergeant Rager's search of the garage.  While none of the adults in the house verbally agreed to the search, the video footage shows them cooperating with Sergeant Rager, answering his questions, and stepping out of his way to allow him into the house.  *Accord United States v. Ortiz*, 455 F. App'x 669, 671–72 (6th Cir. 2012) (finding that under the circumstances, stepping back,

gesturing, and opening the door wider unambiguously conveyed assent). Because Sergeant Rager was legally present in the place from which he could plainly see part of a pistol grip, he was permitted to seize the evidence under the plain view exception to the warrant requirement. Therefore, under the circumstances, Sergeant Rager's search of the backpack did not violate the Fourth Amendment.

## III.   CONCLUSION

Based on the foregoing, Defendant's Motion to Suppress (Doc. 17) is **DENIED**.

**IT IS SO ORDERED.**


                                        */s/ Michael R. Barrett*            _
                                        Michael R. Barrett, Judge
                                        United States District Court